# Eshleman, Appellant, *v.* Union Stock Yards Company.

*Negligence—Stockyards—Communication of diseased cattle—Texas fe-ver—Cattle regulations—Nonsuit.*

The "Regulations Concerning Cattle Transportation," issued by the secretary of agriculture, are ineffectual in this state, inasmuch as the legislature has not co-operated with the secretary of agriculture in their enforcement.

The keeping of an animal having an infectious disease is not per se culpable, and a person keeping such an animal cannot be held liable for the death of other animals resulting from infection from the animal in question, unless it appears that he had knowledge of the existence of the infectious disease in his own animal, and that the spread of the disease and the resultant loss was due to his negligence.

In an action to recover damages from a stockyard company, for the death of cattle caused by Texas fever, it appeared that on Texas or southern cattle there is at times a parasite called a tick. To the southern cattle it is harmless. Being brought north by southern cattle, after it is in this country, it falls from the animals to the ground and lays its eggs in grass or other material. The eggs are hatched out, the young ticks crawl onto the domestic cattle, and these cattle become infected by the tick biting them. Under the act of congress of May 29, 1884, Texas fever is specifically excepted from the class of infectious diseases. A railroad company ran into the defendant's yard two carloads of cattle, described merely as southern cattle, to be fed and watered. These cattle were placed in two pens belonging to a dealer, overnight, and then forwarded. The dealer subsequently placed his own cattle in the pens and these cattle were afterwards sold to plaintiff, in whose possession they died from Texas fever. The interval between the time the southern cattle were placed in the pens, and the northern cattle placed therein was sufficient for the eggs of the ticks to hatch out. There was no affirmative proof that the cattle bought by plaintiff were in fact infected from the pens in question. *Held*, (1) that the evidence was insufficient to show negligence on the part of the defendant; (2) that the plaintiff had no cause of action against the defendant even if the cattle became infected in the pens, inasmuch as the injury was to the dealer, and no right of action for negligence would pass through the dealer to the plaintiff; and (3) that a nonsuit was properly entered.

In all actions of negligence, he who is guilty of the wrong is liable for the damage sustained to anyone injured by the wrongful act. He is responsible, however, to him to whom the wrong is done, and not to those who suffer the remote consequences of it. If, while in the posses-

sion of either real or personal property, an injury is done to that property, the right of action is alone in the then owner, and not in any successor in the title.

Argued May 18, 1908. Appeal, No. 263, Jan. T., 1907, by plaintiff, from order of C. P. Lancaster Co., Jan. T., 1905, No. 8, refusing to take off nonsuit in case of Samuel Eshleman v. The Union Stock Yards Company. Before FELL, BROWN, POTTER, ELKIN and STEWART, JJ. Affirmed.

Trespass to recover damages for death of cattle from Texas fever.

At the trial the court entered a compulsory nonsuit which it subsequently refused to take off, LANDIS, P. J., filing the following opinion :

This action for damages by the plaintiff rests upon the basis that the defendant company permitted cattle with Texas ticks upon them to be placed in its yards, and thereby Texas fever was communicated to cattle which he subsequently purchased, with the results that some of them died. The stock yards and cattle pens—which are owned by the Pennsylvania Railroad Company, but are leased by it to the defendant company— are located along the line of the Pennsylvania Railroad, adjacent to the city of Lancaster. These yards are used by shippers and wholesale dealers in cattle, and the plaintiff has been accustomed, for some time, to buy his stock there. Martin H. Flickinger was one of these wholesale dealers who did business at these yards and certain pens, numbered Nos. 59 and 31, were generally used for his cattle and were known as his pens. On Saturday evening, June 21, 1904, two carloads of cattle, containing forty-four head, from St. Louis, came to the stock yards. They were billed to Philadelphia, and were marked, " Off at Lancaster to feed and water." They had been purchased for slaughter purposes. These cattle were taken from the cars and placed in the rear of these so-called Flickinger pens, where they remained overnight. On the following morning (Sunday), they were moved to the lower part of the yards, to what is called the " willow " pen. Flickinger, receiving notice of their arrival at the stock yards, came to Lancaster on Monday morning, and directed the superin-

tendent of the yard to ship the cattle to their destination. Upon seeing them he said : " I see they are tick cattle. . . . Take caution with them ; they are not lawful to handle, unless you clean the pens right, and do the right thing." They were taken from the willow pen, placed in cars and shipped to Reading, where they were killed at the Reading abattoir. There was no evidence of any mark upon the cars which brought them to Lancaster, but it was testified that the manifest showed that they were southern cattle, and it was proven that there were ticks upon them. After they were unloaded at Lancaster, fat cattle of F. C. Musser were placed in the same cars and shipped to New York.

On August 3, 1904, Flickinger sold to the plaintiff thirteen head of butcher cattle. He had purchased them from S. B. Hedgen & Company, of Pittsburg, on August 1. On August 10, 1904, he sold to the plaintiff a second lot of ten or eleven cattle, and August 17 a third lot of nine head. All of these cattle were apparently placed, with his consent, in, and were sold out of, pens Nos. 59 and 31. The second lot was bought from a man by the name of Hoover, who also deals at the yards, and were taken from Hoover's pens and placed in Flickinger's pens, and the third lot was bought from Musser. Flickinger stated that, while he did not examine the cattle particularly for ticks, they seemed to him at the time he sold them to be clean and healthy ; and Musser says that the cattle he sold to Flickinger were apparently healthy cattle. The cattle were bought by Eshleman in the morning, taken out and weighed, and put back into the Flickinger pens until afternoon or evening, and then driven away by Eshleman. Eshleman kept the first lot about two weeks in pasture. He then sold eight of them to Daniel S. Leib, but only delivered seven. The one he retained died a few days after. Six of those thus sold to Leib died and were replaced with four other cattle, and Eshleman promised to replace the other two. Of the second lot all died. Some had been sold outright by Eshleman to other parties and paid for ; but three had been contracted to Martin Doster, and four to a Mr. Hummer. Of the third lot two died, one of which was contracted to John Ruhle. It was shown that there were Texas ticks upon all the cattle that died.

The evidence showed that Texas or southern cattle have at times upon them a parasite which is called a "tick." To the southern cattle it is harmless. Being brought north by southern cattle, after it is in this country, it falls from the animals to the ground and lays its eggs in grass or other material. The eggs are hatched out, the young ticks crawl on to the domestic cattle, and these cattle become infected by the tick biting them. The original tick, after it lays its eggs, dies, and no harm can result from it; but it is the progeny of the dead tick that causes the infection and produces Texas fever in the domestic cattle. For the hatching of the eggs and for the process of incubation of the disease about thirty days is the minimum time. One witness said that it takes twenty-eight or thirty days until the young tick is able to crawl on the animal, and in about ten days thereafter symptoms of the disease appear. Although the plaintiff's statement alleges that the defendant "carelessly and negligently, and without having first properly disinfected and cleaned said pens, lanes and alleys, caused and permitted other cattle not infected with said germ, parasite or tick, . . . . to be driven through the aforesaid lanes and alleys and to be confined in the same pens in which the said infected cattle had been confined," there was no proof presented that the pens, lanes, alleys had not been disinfected, nor was there any evidence that they had not been cleaned. There was no proof that any ticks were found by anyone in these pens, Nos. 59 and 31, or upon any cattle while in the pens. The inference is made that, because, on June 21 and 22, the cattle of Flickinger, which had ticks upon them, were overnight in the rear of these two pens, and were afterwards driven through the yard to the willow pen, and thence to the cars, therefore the plaintiff's cattle, placed in the same pens from August 3 to 17, or driven through the yard, became infected, by reason of which some of them died. These were the facts upon which the plaintiff insists that the defendant company is liable for the loss sustained. But two questions seem to be involved in this case: The first is, whether there was any carelessness or negligence proved against the defendant company; and the second is, whether, even this be so, the plaintiff is in a situation to recover damages from the defendant company.

There was no evidence presented that the cattle which were purchased by Flickinger at St. Louis in June, 1904, were Texas cattle. All that was elucidated upon that subject was, that, in the manifest, they were marked as southern cattle. They may, or may not, have come from an infected district. The principle, therefore, which has been held by some courts and denied by others, that judicial notice will be taken of the fact that Texas cattle have some contagious or infectious disease communicable to native cattle, cannot be invoked. There is no presumption in this case against the defendant.

The cattle were consigned to Philadelphia, but were to be left off at Lancaster to feed. This was done on the evening of Saturday, June 21. The railroad company, under the act of congress of March 3, 1873, chap. 252, sec. 1, was not permitted to confine in its cars cattle carried or transported from one state to another for a longer period than twenty-eight consecutive hours, without unloading the same for rest, water and feeding for a period of at least five consecutive hours, unless prevented by storm or other accidental causes. The unloading of the cattle, therefore, at Lancaster, for the purpose of watering and feeding them, was proper, and no liability attaches on that account.

There is no statute in Pennsylvania relating to Texas fever as such, though there are laws preventing the sale of diseased cattle, and the " State Livestock Sanitary Board " is authorized to prohibit their importation and to make and enforce rules and regulations in relation to contagious or infectious diseases as may from time to time be required. There is no evidence that any rules have been adopted which affect this controversy. There has been no act of congress presented that imposes liability, though certain rules of the United States bureau of animal industry were offered and admitted in this case. These rules were supposed to have been authorized by the act of congress, known as the " Animal Industry Act," of May 29, 1884, chapter 60. By the first section of that act, the commissioner of agriculture was directed to organize in his department a bureau of animal industry, to appoint a chief thereof, who should be a competent veterinary surgeon and whose duty it should be to investigate and report upon the condition of the domestic animals of the United States, their protection and use, and

also to inquire into and report the causes of contagious, infectious and communicable diseases among them, and the means for the prevention and cure of the same, and to collect such information on these subjects as should be valuable to the agricultural and commercial interests of the country ; and by section 3, it was made the duty of the commissioner to prepare such rules and regulations as he might deem necessary for the speedy and effectual suppression and extirpation of said diseases, and to certify such rules and regulations to the executive authority of each state and territory, and invite said authorities to co-operate in the execution and enforcement of the act ; and whenever the plans and methods of the commissioner should be accepted by any state or territory in which pleuro-pneumonia or other contagious, infectious or communicable disease is declared to exist, or such state or territory should have adopted plans and methods for the suppression and extirpation of said diseases, and such plans and methods should be accepted by the commissioner, and whenever the governor of a state or other properly constituted authorities signify their readiness to co-operate for the extinction of any contagious, infectious or communicable disease in conformity with the provisions of this act, the commissioner was authorized to expend as much of the money appropriated by the act as might be necessary in such investigations, and in such disinfection and quarantine measures as might be necessary to prevent the spread of the disease from one state or territory into another.   If any authority exists in the commissioner to make rules and regulations, it is under section 3, above recited, but it has been held, by the United States supreme court, in Reid v. Colorado, 187 U. S. 137 (Mr. Justice Harlan delivering the opinion of the court), that " Congress did not assume to declare that the ' rules and regulations ' which that department might adopt as necessary ' for the speedy and effectual suppression and extirpation of said diseases ' should have in themselves, or apart from the action of a state, any binding force upon the states.   They were to be certified to the executive authority of each state, and the co-operation of such authorities in executing the act of congress invited.   If the authorities of any state adopted the plans and methods devised by the department, or if the state authorities adopted meas-

ures of their own which the department approved, then the money appropriated by congress could be used in conducting the required investigations and in such disinfection and quarantine measures as might be necessary to prevent the spread of the diseases in question from one state or territory into another. Congress did not intend to override the powers of the state to care for the safety of the property of their peoples by such legislation as they deemed appropriate. It did not undertake to invest any officer or agent of the department with authority to go into a state and without its assent take charge of the work of suppressing or extirpating contagious, infectious or communicable diseases there prevailing and which endangered the health of domestic animals." In Mullen v. Western Union Beef Company, 49 Pac. Repr. 425, the plaintiff introduces in evidence an order, called " Regulations Concerning Cattle Transportation," issued by the secretary of agriculture, and it was held, by the court of appeals of Colorado, that such regulations were ineffectual in any state which did not co-operate with the secretary in their enforcement, and, in the absence of such co-operation, were outside of his authority. Upon the same general question is the case of Illinois Central Railroad Company v. McKendree, which was decided by the supreme court of the United States, on December 17, 1906, but has not yet been reported. These regulations should not have been admitted upon the trial, and they will, therefore, not be considered in arriving at our conclusion upon this rule.

There being, therefore, an absence of statutory authority to sustain the plaintiff's cause of action, if recovery can be had, it must be by force of the common law. The rule of the common law is, that knowledge is indispensably necessary to a recovery, and that negligence must be proven. The keeping of an amimal having an infectious disease is not per se culpable. The right of anyone to use his own property as he pleases for all purposes to which such property is usually applied is unlimited and unqualified, up to the point where the particular use becomes a nuisance. Hence, the keeping of animals having an infectious disease on one's own property, although the adjoining premises have upon them other animals which are likely to be infected by the disease, is not unlawful, nor will it

give the owner of the adjoining premises a cause of action for damages sustained in consequence of the disease being so communicated to his animals, unless the person owning the diseased animals knows the fact that they are diseased and is guilty of some negligence in the manner of keeping them : Fisher v. Clark, 41 Barbour (N. Y.), 329 ; Mill v. N. Y. & H. R. R. Company, 41 N. Y. 619. Even the keeping of diseased animals on the defendant's uninclosed lands, to which other animals are in the habit of coming, and where it is no trespass for them to come, it is not an act of negligence, if the owner of the healthy animal is duly warned of his danger : Walker v. Herron, 22 Texas, 55 ; 1 Thompson on Negligence, section 917. Except where the owner knows that it is probable that the animals may intrude on an adjoining inclosure, or the statute law forbids a man keeping his diseased cattle in his own pasture, he will not be liable for injury to cattle in an adjoining pasture, unless negligent in the manner of keeping his own : Cyclopedia of Law, p. 332 ; 22 Am. and Eng. Ency. of Law, p. 380 ; Herrick v. Gary, 65 Ill. 101. Nothing can be better settled than that, if one do a lawful act upon his own premises, he cannot be held responsible for injurious consequences that result from it, unless it was so done as to constitute actionable negligence : Rockwood v. Wilson, 65 Mass. 221.

In this case, the railroad company had a right to transport these cattle, even though there were ticks upon them. The sixth section of the act of congress of May 29, 1884, enacts : " That no railroad company within the United States, or the owners or masters of any steam or other vessel or boat, shall receive for transportation or transport from one state or territory to another, or from one state into the District of Columbia, or from the District into any state, any livestock affected with any contagious, infectious or communicable disease, and especially the disease known as pleuro-pneumonia, nor shall any person, company or corporation deliver for such transportation to any railroad company, or master or owner of any boat or vessel, any live stock, knowing them to be affected with any contagious, infectious or communicable disease, nor shall any person, company or corporation drive on foot or transport in private conveyance from one state or territory to another, or

from any state into the District of Columbia, or from the District into any state, any livestock, knowing them to be infected with any contagious, infectious or communicable disease, and especially the disease known as pleuro-pneumonia; provided that the so-called splenetic or Texas fever shall not be considered a contagious, infectious or communicable disease within the meanings of sections four, five, six and seven of this Act as to cattle being transported by rail to market for slaughter, when the same are unloaded only to be fed and watered in lots on the way thereto." As the proof in this case showed that these cattle were for slaughter, and were put off in the yards of the defendant to be fed and watered, they did not fall within the act of 1884, and were not to be considered as affected with any contagious, infectious or communicable diseases, even though the tick was on them as stated.

Did, then, the evidence show negligence on the part of the defendant company? Outside of cases in which a positive obligation is cast upon a carrier to perform safely a special exercise, the presumption is, that the party has exercised such care as men of ordinary prudence and caution would exercise under similar circumstances, and if he has not, the plaintiff must prove it: The Nitro-glycerine Case, 82 U. S. 524. The duty of a railroad company, in regard to the transportation of freight and passengers and the carrying on of a stock yard in order to facilitate its business, is twofold, the latter being independent and distinct from the former. The business of a stock-yard corporation, except in the character of the property which is the subject of bailment, corresponds in many respects with the business of warehousemen: Delaware, Lackawanna and Western Railroad Company v. Central Stock Yard Co., 45 N. J. Equity, 50. A warehouseman is liable only for negligence in preserving the property deposited with him: McCarty v. N. Y. & Erie R. R. Co., 30 Pa. 247. Their responsibility as warehousemen is but for ordinary neglect. Shenk v. Philadelphia Steam Propeller Co., 60 Pa. 109; Tower v. Grocers' Supply and Storage Co., 159 Pa. 106. Stock yards are not public markets: 26 Am. & Eng. Ency. of Law, p. 1074. It, therefore, seems to us that the plaintiff was bound to show, not only that the cattle were placed in the rear end of Flickinger's pens overnight on June 21, 22, but that they contam-

inated the pens, and the defendant company did not, as set forth in the plaintiff's statement, disinfect and put them in proper condition again. 'It is presumed that it did its duty, and there is no evidence to the contrary. In addition, it was not shown that the cattle which Flickinger sold to Eshleman on August 3, 10 and 17, received their infection from these pens; non constat that they might not have derived the ticks from some other cause. Without any definite proof upon the subject, we are asked to infer, first, that the ticks from Flickinger's cattle were dropped into the pens or driveways on June 21, 22, and, secondly, that those ticks produced another brood, which got upon the cattle sold to Eshleman in the following August. Thus we have an inference upon an inference in order to sustain this action, and no conclusive inference at that.

The next point is, as we have said—conceding, for the purpose of the discussion, the question of negligence—whether the plaintiff is in position to maintain the action. The cattle that died, when placed in these pens, belonged to Flickinger. This is conceded. They were sold out of the pens to, and were taken away by, Eshleman. The mere fact that they were taken to the scales and weighed and then brought back and allowed to remain until Eshleman thought fit to remove them an hour or two later, cannot in any wise affect the principles which govern the case. . It is true that the general rule of the law is, that whoever does an illegal act is answerable for all the consequences which ensue, in the ordinary and natural course of events, though those consequences be brought about by intervening agents, provided such agents were set in motion by the primary wrongdoer, or provided those acts causing the damage were the necessary or legal and natural consequences of the wrongful act: Filer v. Smith, 96 Mich. 347; Eaton v. Winnie, 20 Mich. 156. Thus, to put falsely labeled poison upon the market, to be used by anyone who may need the articles named in the label, is negligence, rendering the defendant liable to any person injured, whether the immediate vendee or not: Thomas v. Winchester, 6 N. Y. 397. Or, as in a case where the defendants were engaged in selling meats, and sold plaintiff's brother a roll of spiced bacon, and he took it to the plaintiff's house, where he boarded, and plaintiff's wife cooked

it for breakfast, and the bacon was in fact spoiled and unfit for food, and made plaintiff sick, on the assumption that the defendant knew that the meat was purchased for consumption and was negligent in selling it, it was held that there was a good cause of action : Craft v. Parker, Webb & Company, 96 Mich. 245.  See, also, 26 Am. and Eng. Ency. of Law, pp. 461, 462.  But, on the other hand, it is decided that answerable negligence exists only where the party whose negligence occasions the loss owes a duty arising from contract or otherwise to the person sustaining the loss: Kahl v. Love, 37 N. J. L. 5.  Therefore, in Losee v. Buchanan, 51 N. Y. 476, it was held that, if an explosion is caused by a defect in the manufacture of a boiler, the manufacturer is not liable, in the absence of proof that such defect was known to him, or was discovered upon examination or by application of known tests ; and in Curtin v. Somerset, 140 Pa. 70, that, in order that a person who has been injured by an accident may hold another responsible therefor upon the ground of negligence, there must be a casual connection between the negligence and the hurt, and such casual connection must be uninterrupted by the interposition between the negligence and the hurt of any independent human agency.  In this case, a contractor for the erection of a hotel building, who used improper material in its construction and in other respects departed from the specifications embodied in his contract, so that the building when completed, was structurally weak and unsafe, was determined not to be liable to a guest of the hotel for an injury caused to him by such defective construction, but occurring after the owner had taken possession.  To the same effect are Fitzmaurice v. Fabian, 147 Pa. 199 ; and First Presbyterian Congregation v. Smith, 163 Pa. 561.  It seems to us to be clear that there may be, in some instances, a recovery without regard to privity of contract.  In all actions of negligence, he who is guilty of the wrong is liable for the damage sustained by anyone injured by the wrongful act.  He is responsible, however, to him to whom the wrong is done, and not to those who suffer the remote consequences of it.  If, while in the possession of either real or personal property, an injury is done to that property, the right of action is alone in the then owner, and not in any successor in the title.  The recent case of Moore v. City of

Lancaster, 212 Pa. 642, determines this principle. Following, then, the same to its logical conclusion, the plaintiff would have no cause of action, if the wrong was occasioned while the property was owned by Flickinger. It must be recollected that it is not contended that the infection was communicated from the defendant's pens to the cattle that were placed therein and by that means conveyed to other cattle belonging to the plaintiff. The evidence is, that the disease was conveyed to cattle owned by Flickinger, but which Eshleman subsequently bought. If Eshleman obtained the cattle from Flickinger contaminated—and no evidence to the contrary appears, for they were in the pens as Flickinger's cattle for the purposes of sale—he took them in the condition in which they then were, and no right of action for negligence would pass through Flickinger to him. No case similar to this one has been cited to, nor found by us, and there is no principle that we know of which permits a stretching of the law to the extent which the plaintiff here endeavors to maintain. We are of the opinion that the judgment of nonsuit was properly entered, and we now refuse to take it off.

Rule discharged.

*Error assigned* was refusal to take off nonsuit.

*D. M'Mullen* and *John E. Malone*, for appellant.—Defendant was guilty of negligence: Herrick v. Gary, 65 Ill. 101; Grimes v. Eddy, 126 Mo. 168 (28 S. W. Repr. 756); Larimore v. R. R. Co., 65 Mo. 167.

If negligent, defendant was liable in damages to Samuel Eshleman, plaintiff: Devlin v. Smith, 89 N. Y. 470; Coughtry v. Globe Woolen Co., 56 N. Y. 124; Carson v. Godley, 26 Pa. 111; Pittsburg v. Grier, 22 Pa. 54; Godley v. Hagerty, 20 Pa. 387; Schubert v. J. R. Clark Co., 15 L. R. A. 818; Heizer v. Mfg. Co., 15 L. R. A. 821; Skinn v. Reutter, 97 N. W. Repr. 152.

*W. U. Hensel*, with him *Coyle & Keller*, for appellee.—No negligence on part of defendant was shown: Mullen v. Beef Co., 49 Pac. Repr. 425; Reid v. Colorado, 187 U. S. 137 (23 Sup. Ct. Repr. 92); Illinois Cent. R. R. Co. v. McKendree, 203

U. S. 514; Fisher v. Clark, 41 Barbour, 329; Mill v. R. R. Co., 41 N. Y. 619; Walker v. Herron, 22 Texas, 55; D., L. & W. R. R. Co. v. Stock Yards Co., 45 N. J. Eq. 50 (17 Atl. Repr. 146); Shenk v. Propeller Co., 60 Pa. 109; Tower v. Grocers' Supply, etc., Co., 159 Pa. 106; McCarty v. R. R. Co., 30 Pa. 247; Nitro-glycerine Case, 82 U. S. 524.

Another insuperable objection to plaintiff's recovery was his failure to prove that the cattle were his when the alleged injury was suffered: Curtin v. Somerset, 140 Pa. 70; Fitzmaurice v. Fabian, 147 Pa. 199; First Presbyterian Congregation v. Smith, 163 Pa. 561; Kahl v. Love, 37 N. J. Law, 5; Moore v. Lancaster, 212 Pa. 642.

PER CURIAM, June 2, 1908:

We are of opinion that the testimony offered at the trial did not establish the plaintiff's right to recover, and that a nonsuit was properly entered for reasons stated in the opinion of the learned trial judge.

The judgment is affirmed.